**AWK SURVIVOR ADVOCATE ATTORNEYS**
1133 Westchester Avenue, Suite N-224
White Plains, New York 10604
914.468.4840
*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| JANE DOE (C.E.)<br><br>**Plaintiff,**<br><br>v.<br><br>FMW RRI I, LLC. and 603 FELLOWSHIP, LLC,<br><br>**Defendants.** | **Civil Action No.**<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

COMES NOW, Jane Doe (C.E.), Plaintiff, and files this Complaint complaining of FMW RRI I, LLC. And 603 FELLOWSHIP, LLC, as Defendants, and respectfully shows the Court as follows:

**INTRODUCTION**

1.      Sex trafficking is a widespread public health crisis that has reached epidemic levels in our communities, causing devastating harm to survivors and imposing a significant financial burden on society.

2.      Estimates are that in 2016 there were as many as 40.3 million victims of human trafficking and sexual exploitation worldwide, including 4.8 million people trapped in sexual exploitation.[1]

---

[1]    Polaris Project, Human Trafficking Statistics, HUMAN TRAFFICKING SEARCH, https://humantraffickingsearch.org/resource/polaris-project-human-trafficking-statistics/ (last visited Mar. 28, 2025).

3.      The exploitation of victims of sex trafficking and prostitution most often does not occur solely at the hands of the traffickers and sex buyers. Rather, hotels often play an equal hand in the exploitation of these victims.

***The Role of the Hotel Industry and Defendant Hotels***

4.      Defendants are aware of the important role that hotels play in the proliferation of sex trafficking and of the revenue they derive from sex trafficking that occurs at their hotels. Sex trafficking is prevalent in the United States, and hotels are the primary place where it happens.[2]

5.      For years, sex traffickers have "been able to reap these profits with little risk when attempting to operate within hotels."[3] In 2014, 92% of calls received by the National Human Trafficking Hotline involved reports of sex trafficking taking place at hotels.[4] The Hotel Industry and Defendants knowingly facilitate and benefit financially and otherwise from sex trafficking at their locations and the specific locations complained of herein.

6.      To address the crisis of sex trafficking at hotels, multiple agencies and organizations who actively combat sex trafficking, including the United States Department of Homeland Security, the National Center for Missing and Exploited Children, the Polaris Project, Love 146, EPCAT, among others, have established recommended policies and procedures for recognizing the signs of sex trafficking.

---

[2] "This is not only a dominant issue, it's an epidemic issue." *See* Jaclyn Galucci, Human Trafficking is an Epidemic in the U.S. It's Also Big Business, Fortune, April 2019, at https://finance.yahoo.com/news/human-trafficking-epidemic-u-apos-134529629.html citing Cindy McCain, who chairs the McCain Institute's Human Trafficking Advisory Council. "It's also something that is hiding in plain sight. It's everywhere—it's absolutely everywhere." *Id*.
[3] *See* Human Trafficking in the Hotel Industry, Polaris Project, February 10, 2016, at https://polarisproject.org/blog/2016/02/10/human-trafficking-hotel-industry; *see also* Eleanor Goldberg, You Could Help Save A Trafficking Victim's Life With Your Hotel Room Pic, Huffington Post, June 2016, at http://www.huffingtonpost.com/entry/taking-a-photo-of-your-hotel-room-could-help-save-a-trafficking-victims-life_us_57714091e4b0f168323a1ed7.
[4] Michele Sarkisian, Adopting the Code: Human Trafficking & the Hospitality Industry, HUMAN TRAFFICKING SEARCH, https://humantraffickingsearch.org/wp-content/uploads/2019/05/Adoptingthecode.report.cornell.pdf (May 2019).

7.    Some of the policies and procedures recommended to the Hotel Industry and Defendants designed to reduce or eliminate sex trafficking on their premises include learning to identify warning signs and indicators of sex trafficking, including but not limited to:[7]

a) Individuals show signs of fear, anxiety, tension, submission, and/or nervousness; Individuals show signs of physical abuse, restraint, and/or confinement; Individuals exhibit evidence of verbal threats, emotional abuse, and/or being treated in a demeaning way;

b) Individuals show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior; Individuals lack freedom of movement or are constantly monitored;

c) Individuals avoid eye contact and interaction with others; Individuals have no control over or possession of money or ID; Individuals dress inappropriately for their age or have lower quality clothing compared to others in their party;

d) Individuals have few or no personal items—such as no luggage or other bags; Individuals appear to be with a significantly older "boyfriend" or in the company of older males;

e) A group of girls appears to be traveling with an older female or male;

f) A group of males or females with identical tattoos in similar locations. This may indicate "branding" by a trafficker; Drug abuse or frequent use of "party drugs" such as GHB, Rohypnol, Ketamine, MDMA (Ecstasy), Methamphetamines, Cocaine, and Marijuana;

3

Possession of bulk sexual paraphernalia such as condoms or lubricant;

g)  Possession or use of multiple cell phones; and Possession or use of large amounts of cash or pre-paid cards.

8.      Plaintiff was trafficked at a hotel owned and operated by Defendants while exhibiting signs and behaviors consistent with these recommendations in the presence of Defendants' employees and agents.

9.      The Trafficking Victims Reauthorization Protection Act (TVPRA) has provided civil remedies at the federal level since 2003 by "allow[ing] trafficking victims to sue their traffickers for money damages in federal court."[5] In 2008, Congress amended the TVPRA to expand its scope through creation of "beneficiary" liability, providing sex-trafficking victims with a cause of action to sue defendants who—though not criminally liable under the TVPRA— benefited from "participation in a venture which that person knew or should have known" was engaged in criminal sex trafficking.[6]

## **PARTIES**

10.     Plaintiff was at all relevant times a trafficked person as that term is defined in the TVPRA 22 U.S.C. § 7102. Plaintiff is a resident of Burlington County, New Jersey. Given the nature of these allegations, this complaint identifies the plaintiff as "Jane Doe" throughout. She may be contacted through her lead counsel, whose information is contained below.

---

[5] Kathleen Kim & Kusia Hreshchyshyn, Human Trafficking Private Right of Action: Civil Rights for Trafficked Persons    in    the    United    States,    16    HASTINGS    WOMEN'S    L.J.    1    (2004) https://repository.uclawsf.edu/cgi/viewcontent.cgi?article=1288&context=hwlj.
[6] TVPRA 2008: William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No. 110 457, 122 Stat. 5044.

11.    There is a collective and compelling interest in keeping Jane Doe's identity anonymous.

*FMW RRI I LLC*

12.    FMW RII I LLC is a Texas limited liability company with its principal address 605 S Front Street, Columbus, OH 43215.

13.    All references to FMW RRI I LLC include any department, division, office, agency, subsidiary, or corporate affiliate whether domestic, foreign, and/or international. The term also includes any director, officer, agent (either with direct/actual authority and implied/apparent authority), employee, person, firm, or corporation acting on behalf of FMW RII I LLC now or at any time relevant to the claims herein.

14.    Defendant FMW RII I LLC may be served through its registered agent: Corporation Service Company DBA CSC Lawyers Inco., 211 E 7th Street, Suite 620, Austin, TX 78701.

*603 Fellowship LLC*

15.    603 Fellowship, LLC is a Delaware limited liability company with its principal place of business on 603 Fellowship Road, Mt. Laurel Township, NJ 08054.

16.    All references to 603 Fellowship, LLC include any department, division, office, agency, subsidiary, or corporate affiliate whether domestic, foreign, and/or international. The term also includes any director, officer, agent (either with direct/actual authority and implied/apparent authority), employee, person, firm, or corporation acting on behalf of 603 Fellowship, LLC now or at any time relevant to the claims herein.

17.    Defendant 603 Fellowship, LLC may be served through its registered agent: Mehul Khatiwala, 561 N Dupont Highway, Dover, DE 19901.

## JURISDICTION AND VENUE

18.     This Honorable Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, because this action arises under the Constitution, laws, or treaties of the United States (with an amount in controversy that exceeds $75,000.00).

19.     This is a civil action alleging, inter alia, violations of 18 U.S.C. § 1595.

20.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claims asserted in this action, including Defendants' misconduct and omissions, occurred in the judicial district where this action is brought.

## SEX TRAFFICKING UNDER FEDERAL LAW

21.     Sex trafficking is defined by the TVPRA under 22 U.S.C. § 7102, as "the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purposes of a commercial sex act and in which the commercial sex act is induced by force, fraud, or coercion." This definition combines three elements of sex trafficking as a criminal offense: the act, the means, and the purpose.

22.     Pursuant to 18 U.S.C. § 1591(a), all who knowingly provide or obtain commercial sex that was provided or obtained through force, fraud, and coercion – or performed by a minor under the age of 18 – are guilty of sex trafficking. This includes, at a minimum, **_both_** the 'traffickers' who recruit, harbor, transport, and provide individuals for forced commercial sex work **_and_** the 'johns' or 'buyers' who obtain, solicit, or patronize forced commercial sex work. [7] Criminal liability under 18 U.S.C. § 1591(a)(2) also extends to all who knowingly

---

[7] While the 'pimps' or 'providers' are often referred to as the 'traffickers' and the purchasers are referenced as the 'johns,' or 'buyers' [and such nomenclature is used herein], under federal law **_both_** categories are 'traffickers.'

participate in a venture knowing or in reckless disregard of the fact that the venture is engaged in unlawful sex trafficking.

23.     Under 18 U.S.C. § 1595(1), a victim of unlawful sex trafficking has a civil cause of action against (1) any "perpetrator" who engaged in a criminal violation of 18 U.S.C. § 1591; or (2) any "beneficiary" who knowingly received a benefit from participation in a venture that the person knew or should have known was engaged in sex trafficking.

## STATEMENT OF FACTS

24.     In November 2012, Plaintiff met Stanton Krogulski through Facebook. They would talk to each other through Facebook Messenger until they met in person on Stanton's birthday on December 31st, 2012. Plaintiff and Stanton had begun their relationship at this time.

25.     Stanton's behavior in the beginning was caring. Plaintiff described Stanton giving her a "large lump sum of money", to take care of herself, get her hair done and buy new clothes.

26.     In July 2013, Plaintiff's mother kicked her out of their home because she did not like Stanton. In or around August or September of 2013, Stanton began forcing Plaintiff into sex trafficking at the Red Roof Inns located at 603 Fellowship Road, Mt. Laurel Township, NJ 08054. Stanton claimed that Plaintiff owed him money for all the times he helped her financially and that this is what she'll be doing until she can pay him back.

27.     Stanton would constantly degrade Plaintiff by calling her names such as "whore" and speak poorly of her to others. Stanton would regularly physically abuse Plaintiff and would refuse to get her medical attention. Plaintiff recalls having to sit in her hotel room and heal without medical intervention. Stanton would often threaten to harm Plaintiff's mother and grandparents, causing Plaintiff to fear for them as well as herself if she ever tried to run away. Stanton also

deprived Plaintiff of her glasses and contact lenses, ensuring that she would not be able to see since she already had poor eyesight.

28.    Plaintiff threatened to leave Stanton at one point and Stanton retaliated by choking their Pitbull, Missy, as well as breaking her hip. Stanton had his friend, Beano, take Missy to the vet. This caused Plaintiff to become more fearful of running away as she loved Missy and did not want more harm to come her way.

29.    Plaintiff was not allowed to own a phone and was only provided with a phone by Stanton that could not call out. The phone could only receive calls from Stanton's phone, and any calls made to Plaintiffs phone were automatically forwarded to Stanton's phone.

30.    Plaintiff was forced to regularly take drugs provided by Stanton to keep her complicit. This caused Plaintiff to develop an addiction and obtain criminal charges relating to drugs.

31.    Plaintiff recalls checking into the Red Roof Inns with Stanton beside her. Stanton would withhold Plaintiffs identification documents and only provide them when Plaintiff needed to check into to the motels. Plaintiff recalls staying in the Red Roof Inns for a minimum of four days to a maximum of three weeks, depending on room availability and if they were able to re-rent the room they were currently staying in.

32.    Plaintiff details how a front desk employee of the Red Roof Inns would frequent her room for drugs and sex, as well as frequent another girl's room, Kayla. Plaintiff does not recall the front desk employees name but is able to identify him.

33.    Plaintiff details how she had a warrant out for her arrest at the time she was at the Red Roof Inns. The police showed up to the motel and due to the room being rented in her name, the police knew where to find her. The front desk employee called Plaintiffs room to notify her of

the police presence. The housekeeping staff hid Plaintiff in the room next door until the police left the motel. Plaintiff does not recall the housekeepers' name but is able to identify her. This housekeeper would also frequent Plaintiff's room, but only to use drugs not for sex. The same housekeeper would consistently change the bed sheets and give extra bed sheets and towels every day as well as clean the rooms. The rooms were often in dishevelment with dirty sheets and sometimes blood from when Stanton would abuse Plaintiff and drugs on the table.

34.     Plaintiff describes seeing up to 15 Johns a day, totaling around 45 minutes for each John. The Red Roof Inns was set up with room doors on the outside of the building, so the Johns could walk right up to her room without having to go through the lobby or check in with the front desk.

35.     Plaintiff was able to escape trafficking on her birthday on November 7, 2015, after Stanton physically abused her to the point, she sustained skull fractures, contusions, and could not see. Plaintiff had bald spots from where her hair was pulled and was unrecognizable. Stanton abused her because he thought she was enjoying the sex too much when he would watch her with the Johns. The abuse took place at the Red Roof Inn.

36.     Plaintiff was able to find a patron of the Red Roof Inn and borrow their phone to call her friend to take her to the hospital after Stanton fled from the hotel. That was the last time Plaintiff was sex trafficked and saw Stanton.

37.     Since Plaintiff escaped, it has been hard for her to maintain relationships due to having trust issues and emotional issues. Plaintiff is currently in therapy to work through her trust issues and emotional issues. Plaintiff also experiences depression and anxiety as a result of the trafficking.

38.     Upon information and belief, Plaintiff's trafficker, Stanton, rented a specific set of rooms at Red Roof Inns by paying for the room using cash or payment with drugs.

39.     Staff at the Red Roof Inns knew or had a reasonable opportunity to observe Plaintiff who was being sexually exploited daily.

40.     At all relevant times, Red Roof Inns, Inc, owned and operated the Red Roof Inns hotel.

41.     At all material times, Red Roof Inns, Inc., Red Roof Franchising, LLC, FMW RII I LLC, 603 Fellowship, LLC, (hereinafter collectively referred to as "Red Roof Inns") participated directly in the operation and management of Red Roof Inns and exercised systematic control over this Red Roof Inns location with respect to the operation of their respective hotels.

42.     At all relevant times, Red Roof Inns, Inc., was the owner of Red Roof Inns. Defendants jointly employ the employees of the Red Roof Inns and because they jointly exercise a high degree of control over the terms and conditions of their employment. Defendants have a high degree of unified operations at Red Roof Inns where Plaintiff was trafficked for money. Defendants share the common policies and practices complained of throughout this Complaint. Defendants are separately and jointly responsible for compliance with all applicable laws and jointly and severally liable for any damages caused by employees of Red Roof Inns. Defendants had, at all relevant times, direct and systemic control over this facility, responsibility for its operations, and corporate knowledge of the events that occurred at Red Roof Inns. Red Roof Inns is an alter ego, representatives, and/or agent of Red Roof Inns, Inc.

43.     Red Roof Inns Inc., exercises or has the right to exercise control over business operations, management, supervision, administration, and procedures at the Red Roof Inns. Red Roof Inns, Inc., retains and exercises control over aspects of the operation of the Red Roof Inns

directly relevant to Plaintiff's complaint, including but not limited to: a central online reservation system, revenue management tools, loyalty programs, the hotel website, policies and procedures regarding hotel security, policies and procedures regarding identification requirements and payment method requirements, policies and procedures regarding response to signs of human trafficking, training of hotel staff, and requirements for hotel staff to report suspicions of criminal activity, were involved in day-to-day consulting on operational issues at hotel; access to surveillance systems; collected and monitored data that showed patterns consistent with trafficking; participated in internal investigations; and solicited and received customer feedback and complaints.

44.     Red Roof Inns, Inc., facilitated the trafficking through repeated renting of rooms and substantial oversight over hotel operations. Because of the reporting policy and Red Roof Inns, Inc., monitoring of the Red Roof Inns hotel, Red Roof Inns, Inc., knew or should have known of Plaintiff's trafficking.

## ASSUMED OR COMMON NAME

45.     Jane Doe brings this petition against each Defendant in their assumed or common name and expressly reserves the right to substitute the true name of any Defendant if needed pursuant to N.J.A.C. 5:105-2.3(h) or in response to Court Order. Moreover, Jane Doe expressly invokes the right to amend under the relation back doctrine if any Defendants have been properly served but were done so under the wrong legal name.

## FACTS REGARDING THE HOTEL DEFENDANTS

***Human trafficking and sexual exploitation are a rampant, well-known problem in the hotel industry.***

11

46.     What Defendants knew or should have known about the sex trafficking that was occurring at the Red Roof Inns including the trafficking of Plaintiff, is shaped by the widely known and pervasive relationship between the hotel industry and sex trafficking.

47.     75% of survivors responding to Polaris's survey reported coming into contact with hotels at some point during their exploitation…Unfortunately, 94% also disclosed that they never received any assistance, concern, or identification from hotel staff." See The Polaris Project.8

48.     As detailed herein, sex trafficking is widespread in the United States, particularly within the hotel industry, and Defendants were well aware that their hotels served as a primary venue for such activities.

49.     Recognizing the unique vantage point that hotel owners and staff have to identify potential human trafficking victims on their properties, the major hotel chains, and owner/operators, have told the public they have accepted the unique opportunity and responsibility to stop facilitating sex trafficking.

50.     To meet that responsibility, major hotel chains, including Defendants, have adopted robust anti-human trafficking policies to train its employees to identify and properly respond to the "red flags" of sex trafficking. Each Defendant named herein had the opportunity and responsibility to adopt, implement, and enforce similar policies at Red Roof Inns. Unfortunately for Plaintiff, such policies were either not in place or were not enforced.

---

8 *Hotels and Motels Recommendations*, The Polaris Project, https://polarisproject.org/hotels-motels-recommendations/ (last visited July 3, 2025).

12

*The Hotel Industry's Role in Sex Trafficking*

51.    Today, sex slavery is pervasive in the United States, and hotels are the primary place where it happens.[9] For years, sex traffickers have "been able to reap these profits with little risk when attempting to operate within hotels."[10]

52.    In 2014, 92% of calls received by the National Human Trafficking Hotline involved reports of sex trafficking taking place at hotels.[11]

53.    To address the crisis of sex trafficking at hotels, multiple agencies and organizations who actively combat sex trafficking, including the United States Department of Homeland Security, the Polaris Project, among others, have established recommended policies and procedures for recognizing the signs of sex trafficking and have made hotel operators, including Defendants, aware of this information.[12]

54.    Some of the recommended policies and procedures intended to reduce or eliminate sex trafficking, include learning to identify warning signs and indicators of sex trafficking, including but not limited: [13]

---

[9] This is not only a dominant issue, it's an epidemic issue." *See* Jaclyn Galucci, Human Trafficking is an Epidemic in the U.S. It's Also Big Business, Fortune, April 2019, at https://fortune.com/2019/04/14/human-sex-trafficking-us-slavery/ citing Cindy McCain, who chairs the McCain Institute's Human Trafficking Advisory Council. "It's also something that is hiding in plain sight. It's everywhere—it's absolutely everywhere."

[10]    *See* Human Trafficking and the Hotel Industry, Polaris Project, March 1, 2015, at https://polarisproject.org/resources/human-trafficking-and-the-hotel-industry/; *see also* Eleanor Goldberg, You Could Help Save A Trafficking Victim's Life With Your Hotel Room Pic, Huffington Post, June 2016, at https://www.huffpost.com/entry/taking-a-photo-of-your-hotel-room-could-help-save-a-trafficking-victims-life_n_57714091e4b0f168323a1ed7.

[11] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hospitality Industry*, CORNELL UNIV. SCH. OF HOTEL ADMIN. THE SCHOLARLY COMMONS, Oct. 2015, https://humantraffickingsearch.org/wp-content/uploads/2019/05/Adoptingthecode.report.cornell.pdf.

[12] https://www.dhs.gov/blue-campaign; United States Department of Homeland Security Blue Campaign – One Voice. One Mission.    End Human Trafficking.    Source:    https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf; https://www.missingkids.org/theissues/trafficking#riskfactors; https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf;

[13] U.S. Dep't of Homeland Sec., *Blue Campaign – One Voice. One Mission. End Human Trafficking*, https://www.dhs.gov/medialibrary/collections/23518 (last visited July 3, 2025).

a)      Individuals show signs of fear, anxiety, tension, submission, and/or nervousness;

b)      Individuals show signs of physical abuse, restraint, and/or confinement;

c)      Individuals exhibit evidence of verbal threats, emotional abuse, and/or being treated in a demeaning way;

d)      Individuals show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior;

e)      Individuals lack freedom of movement or are constantly monitored;

f)      Individuals avoid eye contact and interaction with others;

g)      Individuals have no control over or possession of money or ID;

h)      Individuals dress inappropriately for their age or have lower quality clothing compared to others in their party;

i)      Individuals have few or no personal items—such as no luggage or other bags;

j)      Individuals appear to be with a significantly older "boyfriend" or in the company of older males;

k)      A group of girls appears to be traveling with an older female or male;

l)      A group of males or females with identical tattoos in similar locations. This may indicate "branding" by a trafficker;

m)      Drug abuse or frequent use of "party drugs" such as GHB, Rohypnol, Ketamine, MDMA (Ecstasy), Methamphetamines, Cocaine, and Marijuana;

n)      Possession of bulk sexual paraphernalia such as condoms or lubricant;

o)      Possession or use of multiple cell phones; and

p)      Possession or use of large amounts of cash or pre-paid cards.

55.      Recognizing the unique position that hotel owners and staff often hold in identifying potential human trafficking victims on their properties, several major hotel chains, and owner/operators, have publicly acknowledged their opportunity and responsibility to prevent

facilitating sex trafficking. To meet that responsibility, several (if not most) major hotel chains have adopted robust anti-human trafficking policies to train its employees to identify and properly respond to the "red flags" of sex trafficking. Each Defendant named herein had the opportunity and responsibility to adopt, implement, and enforce similar policies at Red Roof Inns. Unfortunately for Plaintiff, Defendants failed to do so.

***The Use of Red Roof Inns Branded Properties for Sex Trafficking is Prevalent***

56.    Red Roof Inn is an American economy hotel chain with nearly 700 properties across the U.S. and internationally.

57.    Numerous tragic stories highlight the deeply rooted and widespread role of Red Roof Inns hotel brands as venues for sex trafficking across the United States for years.:

> a)    A 17-year-old Florida woman identified as Jane Doe A.M.C. was sex trafficked in 2015 at a Red Roof Inn property in Florida, where traffickers reserved multiple rooms at once, often housing two to three women per room, paid in cash or with prepaid cards, and generated heavy male foot traffic with brief stays, while hotel staff accepted payoffs to ignore the obvious signs of exploitation.[14]

> b)    A 13-year-old runaway identified as Jane A.B. Doe was raped nearly 1,000 times starting in 2015 across multiple Red Roof Inn properties including in Houston, Texas, where hotel employees acted as lookouts, participated in assaults, ignored screams and visible bruises, and directed traffickers to hidden entrances to avoid detection while profiting from the steady revenue. [15]

> c)    A 17-year-old New Jersey woman identified as Jane Doe was beaten, raped, and sold for sex repeatedly from 2014 to 2015 at the Red Roof Inn in Mount Laurel, New Jersey, where traffickers chased her half-

---

[14] Jacey Fortin, *Florida Woman Says Ohio-Based Red Roof Inn Ignored Sex Trafficking in Federal Lawsuit*, Columbus Dispatch (Aug. 4, 2025), https://www.dispatch.com/story/news/courts/2025/08/04/red-roof-inn-lawsuit-sex-trafficking-ohio-florida/85509556007/.

[15] Richard Winton, *Woman Accuses Major Motel Chains of Enabling Sex Trafficking*, L.A. Times (Feb. 5, 2025), https://www.latimes.com/california/story/2025-02-05/motel-chains-accused-sex-trafficking.

naked into the parking lot as she screamed for help, yet staff allowed the exploitation to continue unchecked despite the blatant indicators of abuse.[16]

d)      Eleven women, some minors, were repeatedly trafficked, raped, and beaten from 2009 to 2018 at Red Roof Inn locations in Smyrna and Buckhead, Georgia, where staff ignored cash payments by bruised underage girls, excessive linen changes for condom disposal, and heavy prostitution activity, even joking about "pimps and hos" and warning traffickers of police presence to sustain profits. [17]

e)      Four women identified as Jane Does were tortured, drugged, and trafficked for sex from 2010 to 2017 at Red Roof Inn properties in Smyrna and Buckhead, Georgia, which were known as "trafficking venues" where employees purchased sex acts from victims, ignored guest complaints about prostitution, and warned pimps of law enforcement despite repeated police alerts.[18]

f)      A survivor identified as Doody was trafficked and forced into prostitution from 2014 to 2015 at multiple Red Roof Inn properties in Massachusetts, where three men controlled her life and hotel staff chose to "look the other way" despite obvious signs of coercion and abuse to maintain revenue streams.[19]

g)      A minor identified as A.M.G. was sex trafficked from 2012 to 2014 at two Red Roof Inn locations in Virginia Beach, Virginia, where defendants exhibited constructive knowledge through repeated red flags including malnourished victims, pimp-controlled check-ins, and excessive male visitors, yet failed to intervene under vicarious liability provisions.[20]

---

[16] Staff, *Sex Trafficking Survivor Sues Motel 6, Wyndham & Red Roof Inn*, Lawsuit Info. Ctr. (Mar. 9, 2025), https://www.lawsuit-information-center.com/human-trafficking-lawsuits.html.

[17] Madeleine List, Red Roof Inn Settles with Victims in Historic Sex Trafficking Case, Lawyer Says, Fox 5 Atlanta (June 28, 2024), https://www.fox5atlanta.com/news/red-roof-inn-settles-victims-historic-sex-trafficking-case-lawyer-says.

[18] Meris Lutz, Updated: Red Roof Inn Settles Sex Trafficking Case on Eve of Trial, Atlanta J.-Const. (Nov. 27, 2023), https://www.ajc.com/news/atlanta-news/red-roof-inn-settles-sex-trafficking-case-on-eve-of-trial/CZYCDAQXLNFQVCYMDNM6BJC4JI/.

[19] Staff, Sex Trafficking Survivor is Suing Mass. Hotels She Says Turned a Blind Eye, Boston.com (Oct. 22, 2025), https://www.boston.com/news/local-news/2025/10/21/sex-trafficking-survivor-is-suing-mass-hotels-she-says-turned-a-blind-eye/.

[20] *A.M.G. v. Red Roof Inns, Inc.*, No. 3:23-cv-00789, 2025 WL 588645, at *1 (S.D. Ohio Feb. 24, 2025), *reported in* Lathrop GPM, *Ohio Federal Court Dismisses Perpetrator Liability Sex Trafficking Claims Against Hotel Defendants, Allows Vicarious Liability Claims to Proceed* (Apr. 26, 2025), https://www.lathropgpm.com/insights/ohio-federal-court-dismisses-perpetrator-liability-sex-trafficking-claims-against-hotel-defendants-allows-vicarious-liability-claims-to-proceed/.

***Red Roof Inns Facilitated the Trafficking of Plaintiff***

58.    Between 2013 and 2015, while Plaintiff was being trafficked, her trafficker, Stanton, rented a specific set of rooms for Plaintiff and other trafficking victims and paid for it using cash or drugs as payment. During this time, Plaintiff encountered at least fifteen buyers daily for up to two years and was repeatedly sexually assaulted at the Red Roof Inns.

59.    Stanton always rented the same rooms from Red Roof Inns, occasionally he would allow Plaintiff to rent the room. He was a repeated customer and was known at this location. Stanton had a continuous business relationship between Defendants as he was as regular.

60.    Defendants participated in a common undertaking involving risk and/or profit that violated the TVPRA upon knowing that Defendants participated in a common undertaking involving risk and profit that violated the TVPRA upon knowing, or having reason to know, that trafficking was occurring on their properties. By continuing to rent rooms to traffickers despite clear signs of illegal activity, Defendants knowingly took on the risk of facilitating human trafficking. Their actions not only exposed victims like Plaintiff to further exploitation but also placed themselves in direct violation of the TVPRA. In accepting the profits from these rentals, Defendants knowingly chose to participate in this unlawful venture upon having constructive knowledge of the sex trafficking occurring at this location, understanding the risk of their involvement in trafficking activities and the harm it caused. This participation created a venue for trafficking and solidified their role in a venture that violated the TVPRA.

61.    Upon information and belief, Defendants actively monitored criminal activity occurring at hotels operating under their brand, regularly reviewed and monitored customer reviews of their properties, and developed and implemented uniform policies and procedures to identify, prevent, and mitigate the risk of sex trafficking at their hotels, including the property where Plaintiff was trafficked.

62.    Defendants neglected its legal duty to ensure that its employees, management, and security personnel were properly trained to recognize and report indicators of sex trafficking.

Despite having control over the training and supervision of its employees, Defendants failed to implement adequate training programs that would have empowered staff to detect, report, and prevent sex trafficking activities.

63.    These complaints were provided to Defendants in various forms, including reports from hotel employees, online reviews from guests, and direct complaints to management. Despite this knowledge, Defendants failed to take any meaningful action to address these issues, allowing the trafficking activities to persist.

64.    Defendants' repeated failure to investigate complaints and review evidence of sex trafficking occurring at its hotel constitutes willful blindness to the criminal activity. Defendants' inaction in the face of overwhelming evidence that trafficking was occurring on its premises is equivalent to tacit participation in the trafficking operations. Defendants' failure to take remedial action despite the knowledge of prostitution and trafficking occurring within the hotel establishes its complicity in these activities.

65.    Defendants benefited financially from the activities of sex traffickers, including increased revenue from high turnover of rooms and extended stays often associated with trafficking operations. Defendants had a vested economic interest in ignoring or tolerating these illegal activities, as evidenced by the hotel's unwillingness to take steps to prevent trafficking or to investigate complaints that could negatively impact its financial bottom line. The franchisor of the Defendants' hotel was also aware of the ongoing sex trafficking activities at the hotel, as the franchisor controlled critical aspects of hotel operations, including employee training, policies, and quality control.

66.    Despite being made aware of the complaints and criminal activities occurring at the hotel, the franchisor failed to take any remedial action or conduct a proper investigation into the

hotel's operations. The franchisor's failure to intervene in response to these ongoing illegal activities contributed to the continuation of sex trafficking at the hotel.

***Plaintiff's Trafficking at the Red Roof Inns Could Have Been Prevented***

67.     During her trafficking, Plaintiff's trafficker frequently and regularly used the Red Roof Inns location because he knew that members of the staff looked the other way, despite the obvious signs of sex trafficking associated with Plaintiff's trafficking at Red Roof Inns. Despite this, Red Roof Inns staff continued providing a venue for Plaintiff's sexual exploitation.

68.     Defendants actively contributed to Plaintiff's ongoing trafficking through acts and omissions that facilitated the work of her traffickers, including, but not limited to, adopting policies and procedures that allowed trafficking to flourish in Red Roof Inns properties and failing to implement and enforce adequate anti-sex trafficking policies and training despite their actual knowledge they were profiting off sexual exploitation.

69.     Defendants are responsible for the acts and omissions of the staff of the Red Roof Inns because these acts were committed in the scope and course of their employment for Defendants.

70.     Defendants are responsible for the acts and omissions of the Red Roof Inns staff because Defendants failed to exercise reasonable care regarding the hiring, training, and supervision of these employees, particularly given the risks, known to Defendants, of human trafficking occurring at these hotels.

71.     Defendants, through their agents and employees, had an opportunity to and did observe obvious signs of sex trafficking at the Red Roof Inns and yet allowed it to continue unabated and facilitated and supported it.

72.     Defendants, through their agents and employees, had an opportunity to and did observe obvious signs that Plaintiff was being trafficked at the Red Roof Inns and yet allowed it to continue unabated and facilitated and supported it.

73.     Defendants facilitated sex trafficking of Plaintiff through their failure to adopt, implement, and enforce reasonable and adequate anti-sex trafficking policies and training despite their knowledge of the actual and ongoing problem of sex trafficking at hotel properties, including Red Roof Inns.

74.     The most effective weapon against sexual exploitation and human trafficking is education and training.[21] As ECPAT concluded:

> The hospitality industry is in a unique position to identify and report human trafficking due to its perceived anonymity. Traffickers believe they can go unnoticed while exploiting victims across the globe in hotels— ranging from budget properties to luxury resorts. From check-in to check-out there are a number of indicators victims and exploiters exhibit during the time they are on a hotel property. [22]

75.     This same conclusion is echoed by others who seek to eliminate or minimize sex trafficking in the hospitality industry.[23]

76.     In reference to companies like Red Roof Inns ECPAT observed: "If they do nothing to raise awareness or to prevent child trafficking, they risk becoming an indirect and unintentional conduit for the abuse that takes place."

77.     If Red Roof Inns, Inc., had adequately trained and implemented guidelines, "red flags," training policies and procedures, and other recommendations adopted in the industry, Red

---

[21] Polaris Project, *It's Not Knowing the Signs – It's Knowing the Story*, POLARIS, https://polarisproject.org/recognizing-human-trafficking/.

[22] Sex Trafficking in the Tourism Industry, J. Tourism Hospit. 2015, link at https://www.longdom.org/open-access/sex-trafficking-in-the-tourism-industry-2167-0269-1000166.pd.

[23] Brian O'Connell, Hotels Tackle Human Trafficking: Managers Train Hotel Staff to Spot Warning Signs, INSURANCE NEWS, Mar. 18, 2020, https://www.shrm.org/topics-tools/news/employee-relations/hotels-tackle-human-trafficking

Roof Inns, Inc., would have known of Plaintiff's trafficking at Red Roof Inns and would have been in a position to prevent the trafficking of Plaintiff.

78.    Despite the obvious signs of sex trafficking at the Red Roof Inn, Plaintiff's trafficker was allowed to continue to use Red Roof Inns as the venues for Plaintiff's violent sexual exploitation and trafficking. Adequate training would have prevented Plaintiff's trafficking.

79.    There was also heavy foot traffic in and out of Plaintiff's room, as well as other trafficking victims' rooms, involving men who were not hotel guests. Plaintiff had no less than 7 men a day sexually exploiting her at Red Roof Inns. These individuals entered and left at unusual hours and were present at the hotel for brief periods of time, which are signs of sex trafficking. Had Defendant Red Roof Inns, Inc., enforced the policies and procedures they enacted to prevent trafficking from occurring within their Red Roof Inns branded hotels after observing an obvious sign of trafficking as described above, Plaintiff's trafficking would have been identified and reported, which would have prevented her trafficking at Red Roof Inns.

***Red Roof Inns, Inc. Had Actual Knowledge of the Sex Trafficking Venture***

80.    Based upon public reporting, investigations, criminal incidents, hotel reviews and comments, Red Roof Inns, Inc., had actual knowledge of pervasive and continuous sex trafficking throughout the Hotel Industry, its franchised and owned hotel properties (including Red Roof Inns), and knowingly chose to facilitate sex trafficking at its locations, including Red Roof Inns, and benefited from its participation in a sex trafficking venture. Red Roof Inns, Inc., knowledge went well beyond its general awareness of sex trafficking in the hospitality industry, but actual knowledge of the sex trafficking venture carried on at Red Roof Inns.

81.    Red Roof Inns staff, the "boots on the ground," observed the signs of sex trafficking present before, during, and after Plaintiff's trafficking at Red Roof Inns. These employees were

purportedly required to relay their knowledge of Plaintiff's sex trafficking to Red Roof Inns. Thus, all Defendants knew or should have known about Plaintiff's sex trafficking.

82.    Moreover, the knowledge of the Red Roof Inns staff, including its management-level employees, is imputed to Defendants as corporate knowledge and therefore, all Defendants knew or should have known that Plaintiff was being trafficked in the Red Roof Inns hotel.

***Red Roof Inns, Inc., as Franchisor, Set Standards for Hotel***

83.    Red Roof Inns, Inc., was and are at all material times required to comply with franchise agreement standards, policies, and rules, including those related to security, kidnapping, the trafficking of persons and/or compelled prostitution, if any, promulgated by Red Roof Inns, Inc.

84.    In addition to brand recognition, a marketing organization, hotel listings in the Global Distribution System (GDS) and other online travel agency databases, the brand provides the franchise hotel with access to its brand wide central reservation system, 800 number, revenue management tools, world-class loyalty programs and website. Thus, booking and room reservations are controlled by Red Roof Inns, Inc.[24]

85.    Red Roof Inns, Inc., controlled the time, manner, and method of the hotel's day-to-day operations.

86.    Red Roof Inns, Inc., hotels adhered to consistent standard regarding the day-to-day operations of their respective hotels and exercised control over the means, methods, and tools used by its hotels.

---

[24] Ellen Meyer, The Origins and Growth of Franchising in the Hotel Industry, LODGING MAGAZINE (April 10, 2018) https://lodgingmagazine.com/the-origins-and-growth-of-franchising-in-the-hotel-industry/.

87.     Red Roof Inns, Inc., exercises control over its hotel to ensure quality control by conducting annual on-site inspections to confirm its policies and procedures are complied with.

88.     Red Roof Inns, Inc., exercises control over decisions related to payment options for rooms, including but not limited to allowing payment by cash or pre-paid credit card.

89.     Upon information and belief, Red Roof Inns, Inc., exercises an ongoing right of control over its hotels, through the following actions:

a)      hosting online bookings on Red Roof Inns, Inc., domain;

b)      requiring Red Roof Inns, Inc., branded hotels to use Red Roof Inns, Inc., customer rewards program;

c)      setting employee wages;

d)      advertising employment positions at its franchised hotels;

e)      sharing profits;

f)      standardized training methods for employees;

g)      building and maintaining the facility in a specified manner;

h)      standardized or strict rules of operation;

i)      regular inspection of the facility and operation;

j)      fixing prices;

k)      security policies and procedures;

l)      interior and exterior design decisions; and

m)      other actions that deprive Red Roof Inns branded hotels of independence in their business operations.

90.      Red Roof Inns, Inc., retained control over the details and methods of aspects of the operation of the Red Roof Inns hotel that are directly relevant to the proliferation of sex trafficking

23

at that property. As a result of this retained control and its direct involvement, Red Roof Inns, Inc.,

participated in a venture with sex traffickers who were using the Red Roof Inns, Inc., as a venue

for their trafficking. Moreover, because of this retained control, Red Roof Inns, Inc., had both the

opportunity and the duty to prevent Plaintiff's trafficking.

91.     Red Roof Inns, Inc., retained control over the training of the staff of Red Roof Inns

regarding human trafficking and ways to detect and respond to signs of human trafficking.

Effective training and education are the most important tools to prevent use of hotel facilities for

sexual exploitation and human trafficking. If Red Roof Inns, Inc., had exercised reasonable

diligence in providing training, Red Roof Inns, Inc., would have prevented the Red Roof Inns from

being used to facilitate obvious and apparent sex trafficking, including the trafficking of Plaintiff.

By failing to take reasonable steps to provide appropriate training, despite the overwhelming

evidence it had of an ongoing problem with use of its branded properties for sex trafficking, Red

Roof Inns, Inc., was negligently facilitating sex trafficking.

***Defendants Knowingly Benefitted from Plaintiff's Sex Trafficking***

92.     Defendants knowingly received substantial financial benefit from Plaintiff's

traffickers, including but not limited to revenue generated from room rental and other ancillary

expenses at the Red Roof Inn. Thus, Defendants, benefited directly from providing support to

Plaintiff's traffickers, who Defendants knew or should have known were engaged in illegal sex

trafficking.

93.     Red Roof Inns, Inc., intentionally or knowingly benefited through increased

revenue from rooms rented to Plaintiff's traffickers.

94.     Red Roof Inns, Inc., intentionally or knowingly benefited from participating in a

venture that traffics another person by, among other things, receiving financial benefits from the

24

trafficking venture at their corporate headquarters in Wilmington, Delaware. For every room rented, a percentage is sent by Red Roof Inns, Inc., operating company (for Red Roof Inns, Inc., owned properties) to Defendants at their corporate headquarters in Wilmington, Delaware.

95.     Red Roof Inns, Inc., directly participated in renting rooms from and through the actions of its corporate headquarters. In addition to brand recognition, a marketing organization, hotel listings in the Global Distribution System (GDS) and other online travel agency databases, Red Roof Inns, Inc., hotels utilize its brand wide central reservation system, 800 number, revenue management tools, world-class loyalty programs and a website. Thus, booking and room reservations are controlled by Red Roof Inns, Inc.[25]

96.     Red Roof Inns, Inc., participated in renting rooms through the acts of the staff of Red Roof Inns who are employees Red Roof Inns, Inc., because Red Roof Inns, Inc., exercises control over the terms and conditions of their employment.

97.     As a result of the monies paid by Plaintiff's traffickers to the secure rooms for her trafficking at Red Roof Inns, all Defendants knowingly benefitted from participating in the venture that trafficked, harbored, and maintained Plaintiff's trafficking at Red Roof Inns.

98.     There was a direct causal connection between Defendants' rental of rooms to the trafficker and the facilitation of Plaintiff's trafficking, from which Defendants derived a financial benefit.

99.     As a direct and proximate result of the Defendants' actions and inactions, including Defendants' financial benefit from and failure to intervene in the trafficking occurring at the hotel property. Plaintiff has suffered severe emotional, physical, and psychological harm.

---

[25] Red Roof Inn, Contact Us, https://www.redroof.com/contact-us (last visited Oct. 28, 2025).

## CAUSES OF ACTION

### COUNT I- VIOLATIONOFTHE TVPRA, 18 U.S.C. §1595
### (AGAINST ALL DEFENDANTS)

100.    Plaintiff adopts and incorporates by reference each allegation contained in the preceding paragraphs of this Complaint as fully set forth herein.

101.    Plaintiff is a victim within the meaning of 18 U.S.C. 1595(a).

102.    Defendants are liable as beneficiaries within the meaning of 18 U.S.C. § 1595(a) because, as described above, each Defendant knowingly benefitted, by receiving financial and other compensation, for their participation in a venture they knew or should have known was engaged in sex trafficking, in violation of the TVPRA, 18 U.S.C. § 1591, et seq. Defendants knew that their repeated failures to address known risks of human trafficking at their hotel properties, and to continue providing venues for sex trafficking, would increase the overall volume of illegal commercial sexual exploitation and victimization at their hotel properties. Defendants further knew or should have known that their acts and omissions were advancing the trafficker's sale and victimization of Plaintiff for commercial exploitation at Red Roof Inns.

103.    Each one of the Defendants knowingly received the following benefits as the result of a participating in a venture that Defendants knew or should have known was engaged in sex trafficking:

n)    Profit from renting rooms to those looking to sexually exploit Plaintiff and other human trafficking victims;

o)    Increased profit margins due to lower operation cost by refusing to implement proper training of the Hotel Defendants' employees and managers regarding the signs of human trafficking and the exploitation of victims;

26

p)    Increased profit margins due to lower operation cost by refusing to hire qualified security officers who would actively combat human trafficking and the exploitation of victims;

q)    Increased profit margins because of continued customer loyalty by traffickers and johns who sought to exploit victims, including Plaintiff, due to Hotel Defendants' lack of measures against the exploitation of victims and human trafficking. This customer loyalty led to continued alcohol, food, and room sales;

r)    Increased profit margins because of presenting a more "marketable brand" to traffickers and johns looking to exploit victims–which in turn leads to higher alcohol, food, and room sales when these traffickers and johns visit Hotel Defendants' property; and

s)    Increased profit margins by knowingly catering to the needs of a criminal subculture that is looking for locations that will not actively enforce laws against human trafficking and the exploitation of victims or take active security measures to prevent human trafficking and the exploitation of victims on their property.

t)    Other direct and indirect benefits of both a financial and non-financial nature to be proven at trial.

104.    Each Defendant was a beneficiary of and participated in a venture with, among others, Plaintiff's traffickers. Defendants had an association in fact with Plaintiff's traffickers. Even though Defendants knew or should have known that he was engaged in sex trafficking in violation of the TVPRA, Plaintiff's trafficker was able to continue renting rooms for the

exploitation of Plaintiff. Traffickers, including the trafficker of Plaintiff, frequently used Red Roof Inns because they knew that staff members looked the other way despite obvious signs of trafficking and that Defendants failed to adopt and implement policies to detect and stop trafficking. Thus, there was an implicit agreement between the traffickers and Defendants and their employees and agents, including the staff of Red Roof Inns. Each of the venturers shared a common purpose – the rental of hotel rooms and the making of profits.

105.    Each Defendant profited while Plaintiff's trafficker was able to rent a secure venue to earn profits by trafficking Plaintiff. Each Defendant took affirmative actions in furtherance of the venture by continually renting rooms to sex traffickers including but not limited to Plaintiff's trafficker, failing to properly implement anti-trafficking rules and policies, and assisting traffickers to continue their sexual exploitation with minimal risk of detection and disturbance, all the while ignoring the obvious signs of Plaintiff's trafficking.

106.    Even though they knew or should have known about the exploitation occurring on their properties, Defendants kept receiving benefits from the rental of rooms to traffickers. As a result of Defendants' choice to receive such benefits, many victims, including Plaintiff, were trafficked and exploited on the properties of the Defendants. This provided a venue for trafficking and constitutes participation by Defendants in a venture under the TVPRA.

107.    Defendants committed each of these violations directly, through their own acts and omissions, and through the acts and omissions of their agents, including the staff of the Red Roof Inns.

108.    Defendants' conduct is jointly and severally liable for the entire amount of damages awarded by a jury in this case under TVPRA.

## TOLLING OF LIMITATIONS

109.    To the extent Defendants assert an affirmative defense of limitations, Plaintiff alleges that the statute of limitations was tolled due to fraudulent concealment. As set out above, Defendants made affirmative misrepresentations regarding its alleged efforts to combat human trafficking when in fact they knew these representations were false and knowingly allowed trafficking to occur on their properties and knowingly benefited from the trafficking. Defendants acted with a fixed purpose to conceal the facts necessary for the Plaintiff to know she had a cause of action against them, and Plaintiff did not discover and was not able to discover the existence of a cause of action against Defendants until shortly before suit was filed, and certainly not more than ten years before suit was filed.

110.    To the extent Defendants assert an affirmative defense of limitations, Plaintiff invokes the discovery rule. At the time Plaintiff was harmed, Plaintiff did not know that she was the victim of human trafficking, that her injury arose from being trafficked at Defendant(s) hotels or that she was a person trafficked as the term is used in the TVPRA, much less that she was being victimized by a human trafficking venture, and she did not discover and was not in a position to discover the legal cause of her injury, and certainly not more than ten years before suit was filed. Moreover, at the time the trafficking occurred, Plaintiff did not know what "human trafficking" as the term is used in the TVPRA was, much less that she was being victimized by a human trafficking venture, and she did not discover and was not in a position to discover the existence of a cause of action until shortly before suit was filed, and certainly not more than five years before suit was filed.

111.    In addition, to the extent Plaintiff's claim might otherwise be barred by limitations, limitations should be tolled because Plaintiff could not have reasonably discovered the cause of

action, and/or was under a legal disability pursuant to N.J. Stat. § 2A:14-21 within the limitations period due to psychological trauma she suffered because of the trafficking.

112.    Plaintiff adopts and re-alleges each paragraph above as if set forth herein. Including the damages specifically alleged above, Plaintiff seeks the following damages from all Defendants.

**WHEREFORE,** Plaintiff respectfully requests that this Court grant the following relief: compensatory damages, punitive damages, attorneys' fees and costs, and such other legal and equitable relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: October 31, 2025

Respectfully submitted,

/s *Hillary Nappi*
_____
Hillary M. Nappi
**AWK SURVIVOR ADVOCATE ATTORNEYS**
1133 Westchester Avenue, Suite N-224
White Plains, New York 10604
Telephone: (914) 468-4840
hnappi@awk-saa.com

Krisel McSweeney
*(pro hac vice to be applied for)*
**McSweeney Law Firm**
5550 Glades Rd., Suite 500
Boca Raton, FL 33431
Tel.: 800-540-0668
Kmcsweeney@mcsweeneylawfirm.com